Sub Zeta v. Johnson & Johnson. That's correct, Your Honor. Your Honor, and may it please the Court, Samuel Zakharoff for the plaintiffs in this case. There are two sets of arguments here, and if it's all right with the Court, I'd like to begin with the RICO side of it, because there's an intervening Supreme Court decision that I think makes this a more straightforward analysis. On the RICO question, neither this Court nor the Supreme Court has ever applied Illinois BRIC to RICO, nor has this Court or the Supreme Court ever followed the logic that if some case development arises under the Clayton Act, ergo, it controls for RICO. In fact, the Supreme Court has repeatedly rejected mechanical application of antitrust law in favor of proximate cause. In Horn, for example, the most recent Supreme Court case, the Supreme Court reiterated that RICO only requires, and I quote, a direct relation between the injury asserted and the injurious conduct alleged. This was fully anticipated in this Court's decision in Horn, the case that went up to the Supreme Court. This Court said that Congress made a judgment concerning the degree of attenuation regressible by enacting a proximate cause limitation on RICO's standing. That was fully affirmed by the Supreme Court. The District Court chose not to follow this Court's ruling in Horn, and instead to follow the logic of the Third, Sixth, and Seventh Circuits, and reduced Horn, in its opinion, to the facts, and noted that cert was granted. Now, in some sense, that's an understandable conclusion. Most cases that end up at the Supreme Court get reversed, and this Court was taken up because it was in conflict with the Sixth and Seventh Circuits. Nonetheless, this Court prevailed, and the Supreme Court affirmed, and the District Court should not have disregarded what Horn said quite so cavalierly. Can you tell me, though, how – there's some sort of concern about who appropriately litigates, and how is the end consumer here the best person in these cases, in this claim? Well, under the facts presented here, the end consumer is the only party who is adversely affected. The logic of Illinois BRIC, and the logic that controls the application of the Clayton Act, is that in a cartelized market, all prices are contaminated. There's pollution throughout the market, and therefore, every purchaser into that market feels the brunt of the anti-competitive conduct. But under that logic, then, aren't there endless causation issues and nominal recovery problems that an individual doing it that way or looking at it that way will face? There may be. There may be. And that's the reason that in Illinois BRIC, the Supreme Court said, we want to concentrate the harms in the first-line purchaser, and we want to make sure they have an incentive to sue, both for the policing function and also to avoid apportionment problems or multiple liabilities, as Your Honor raised. However, in – What about our – Go ahead. As you continue to address that, could you explain to us how we should view the consumer in the chain from the – from Johnson & Johnson, the party you're holding responsible through, so that we get a sense of why, even if not a direct purchaser, you think that we should recognize a claim here? Right. So if we go back to the antitrust analogy, what the Court said in Hanover Shoe was, well, just because you pass on the harm to somebody else doesn't mean that you were not harmed. And then Illinois BRIC says, okay, we want only that party to do it. The nature of a claim here is not that there's a cartelized product market, not that the price has been artificially inflated. The claim here is that there was fraud, that there was misrepresentation. In the first instance, the intermediaries were never misrepresented, too. They don't have a cold. They don't need a decongestant. But more critically, under the facts presented in this case, there are four defendants who are not on the RICO side, who are not RICO co-conspirators, but who are defendants on the other part of the case, and they are CVS, Walgreen, Walmart, Target. And all of them produce a house brand of exactly the product that is under challenge here. So it would have the odd quality that if I went into a CVS and one week I bought the CVS-branded drug and the other week I bought Johnson & Johnson's, I would have to ask CVS to sue on my behalf. They would be the intermediary. But they suffered no harm here. In fact, they profited from the very market that's at issue here. And so our view is that this doesn't work the way that the Clayton Act markets do. And as a result, you have to make, you have to analyze, as this Court said in Horn, the degree of attenuation necessary. And in a fraud claim- We have some language in another one of our cases, Sperber, that consumers further removed from their racketeer probably cannot recover under RICO, just as they cannot recover under the antitrust laws. There is language. There is dicta to that effect. But Sperber also has a quote that says, at least some kinds of indirect injury are recoverable under RICO. So it distinguished from a bright-line rule. And Sperber, obviously, is before the Supreme Court's decision in Apple, which hardened the exclusivity point from Illinois BRIC. But Sperber is consistent with the position we're taking here, as is the Alex case, in which this Court said, and I'll quote, that the presence of an intervening actor, and I quote, may in some cases tend to show injury not sufficient proximate cause. Now, that's the analysis that we think should follow. Is there somebody who is more proximately harmed by the alleged fraud here? And are they better situated to enforce it? Our view is that CVS has no claim against Johnson & Johnson. And so to hold them out as the necessary intermediary would be a distortion that- Why do you urge us to conclude that when, weren't they deceived too? I mean, accepting the allegations, if they had known that this was a totally ineffective nasal decongestant, they wouldn't have stopped it. Isn't that the argument for their being the litigant? It could be. It could be. And that would be analogous to the Illinois BRIC-type situation. And is it any part of our concern that here the proposed class plaintiffs, the consumers, are not claiming that anyone got ill or suffered some adverse physical consequence? They're saying either they wouldn't have bought or they wouldn't have paid as much as they did. So we're talking about, what, under $10 a purchase for them, whereas CVS would perhaps be able to complain of hundreds of thousands of dollars of purchases they wouldn't have made? Well, but they also would not complain about the hundreds of thousands of dollars of sales that they got received for their house brand for the identical product. So you don't want to put as a gatekeeper a party who, under the allegations of the complaint, is engaged in exactly the same misconduct. Misconduct, not misrepresentation. There's a question of their knowledge. There is a question of their knowledge. But we're dealing with this as a standing question. We're not anywhere near the facts presented here. And so may I ask, to play out an analogy, in addition to the house brand, do CVS make a profit every time they sell one of Johnson & Johnson's cases to you? I hope so. Otherwise, they're not long for this world. But I assume so, Your Honor, that they would. So it's not, I understood your argument in the briefs to not be just their own house brand, but also there would be sort of an incentive for the consumer. I fully agree with that, Your Honor. I think that the argument is, in the first instance, that they're the wrong party because they have an incentive for the sales of these products. And the second, that they were not deceived. They were not the recipient of the fraud. The specifics of fraud, unlike antitrust, is that it does have the subjective component, the intentionality, and the reliance element. And there's no way that CVS relied on the, this is the best product possible for your cold. Okay. If I may turn to the other part of the argument. Well, let me ask, does anybody have any questions on this part? Okay. I think we're good. We'll hear from you on the vote. Okay. On preemption. No, no, no. We'll hear from you on rebuttal. We're satisfied. Your time is too short. Okay. Didn't get to preemption at all. Good morning, Your Honor. May it please the Court. David Zions on behalf of the defendants. Since the focus has been on RICO, I'm happy to begin there. And address what Professor Issacharoff was saying. And I think there's two basic problems about this analysis that we were going down in terms of what is the exact relationship with CVS and Target and these others. One, as Judge Raggi was alluding to, it is the case that on their theory, they bought a worthless product. The actual fraud they allege in the complaint is actually a fraud against the FDA. They said they defrauded the FDA, who otherwise wouldn't have kept this on the market. And because of that fraud, these products have zero value. CVS, Target, then bought this thing that had zero value. So, of course, they are injured. Do you want to make a much more fundamental point there? Would that same reasoning apply if this had been a product that did cause injury to the consumer? I mean, what if they purchased a product and it turned out to have a really serious physical consequence? I don't think it would be as easy to be dismissive of the consumer's claims of injury. No, Your Honor. And Congress addressed that exactly. And it's in preemption. Now we're kind of getting into the preemption issue. Would there be a physical injury exception? The product liability exception. We wouldn't even be talking about RICO at all. That's about injury to business or property. So we know from Horn that if you have a physical injury, that that leads to some sort of economic injury. That could be OK. But if the claim is, I took a drug and it hurt me, that's not a RICO claim. It very well might be a valid state law claim because Congress intended to carve that out. What it didn't intend is for you to either use state law or RICO to basically do an end run around the entire system of federal drug regulation. I do want to make the point, going back to, I think we have good answers on the merits of why the indirect purchaser rule makes perfect sense here. But I also think that's the wrong analysis. What the Supreme Court has said several times, including in Kansas v. Utilicorp, we take a macro view of this. It's supposed to be a bright line rule. So the analysis is not, in this particular case, do we expect that the overcharge will be passed on or not? In Kansas v. Utilicorp, you had a utility that by law was mandated. Any harm that it suffered, it had to pass on to the rate payers. And the Supreme Court said, that may be very well and good. But we in Hanover, Shoe, and Illinois-Brick laid down a bright line rule. We adhere to it today. Direct purchaser, you can see- The argument here is that the direct purchasers were profiting from the state, and they had any incentive to raise the issues because they're selling the stuff and making money off of it. How do you respond to that argument? You know, one response that I actually don't remember seeing this argument before about you have a profit from this house brand. But I think the much more fundamental issue with that is the Supreme Court told us that's not how the analysis goes. I think if, you know, three circuits have said the indirect purchaser rule is a bright line rule applies in RICO. If this Court were to disagree and say, no, it doesn't, it wouldn't just be for this case unless we're going into this case-by-case exceptions, which the Supreme Court said is incompatible with the bright line nature of the rule. So, you know, this case, you know, I don't agree with the premise that it's really so easy in this case and there's an automatic pass-through. But granted, well, what about the next case when we're talking about prescription drugs and you have pharmacies and PBMs and insurers and doctors and hospitals? I mean, what would you say to the court watchers that suggest that the trend is going toward more exceptions, that the language suggesting a bright line rule might have been too bright? And we see things like Horn and in other cases where we're saying that some antitrust limitations don't extend to RICO. Sure, Your Honor. I think, you know, when you look at the Supreme Court's cases holistically, you look at Horn, which essentially said we reiterate sedima. So I don't think there's a lot new under the sun in Horn. And then you have Holmes where the Supreme Court applies proximate causation principles and says Congress modeled civil RICO after Section 4 of the Clayton Act and that means something. I think when you look at that holistically, you know, there is a coherent approach here, which is you say, yes. But they didn't say, and you can't do it. Right? I mean, that's, I mean, that's the part is, is like, how much do we look to when deciding something that's open in our court, at least the logic and reasoning. And in this case, maybe it's worth some of your time explaining why the logic of the middleman not being harmed here is not apropos. Sure, Your Honor. So what I would say is to first start with the specific case of antitrust injury and then turn to, you know, why, why it makes perfect sense for this rule to apply equally in both contexts. The antitrust injury, you know, argument there was, you know, some courts had fashioned basically an analogy. Obviously, you wouldn't say in a RICO case, you need to have antitrust injury. So there was a kind of translation exercise being undertaken where you try to transplant that and have this analogy to racketeering injury. And, you know, that's sort of incoherent. The court said, we don't really even understand what that means. So you don't just automatically transport everything. What you do is you look, the fact that it is the same language, the same statutory language. And when you look at what the Supreme Court said in Apple versus Pepper, when it described the bright line Illinois brick rule, it said it basically comes from two things. It is the text. It is a construction of the text of Section 4, kind of infused by proximate causation principles. And that gives you a bright line rule. What do we have here? We have the same ingredients. We have almost identical statutory text. And we have proximate causation principles, which we know apply equally in antitrust in RICO because the Supreme Court told us so in Holmes. But I would also say, you know, the antitrust injury issue, which really arose out of some of the peculiarities of you have these broad prophylactic rules in substantive antitrust, which then you could have something that technically violates one of those rules but actually injures someone because it has a pro-competitive effect. The Court in Brunswick said we're concerned about the interplay of those issues, and that's what gives rise to this. There's nothing kind of unique to antitrust, this notion about we stop at the direct purchaser and we don't pass it on. The Supreme Court cited Justice Holmes in the Darnell Tanzer case about a general tendency in the law. These concerns about apportionment do happen in RICO. Judge Easterbrook had a really good discussion of this in the Carter case in the Seventh Circuit, decided right after Sedema, so he addressed this argument that Sedema and the antitrust injury issue means that we shouldn't say this. But he said, no, that is a very specific issue where it is lost in translation when you go from antitrust injury. Before you run out of time, I did want to ask about preemption. One area of concern is the changes being effected process, the CPE process, which I understand applies to NDA, brand name drugs. In the YF case, why is there preemption there, or why are those claims not preempted? Sure, Your Honor. Are you referring specifically to the drugs that are not under the monograph but instead under NDAs?  Putting aside the monograph drugs, the NDA drugs, and as I understand it, only brand name, what about the YF decision in that context? Sure. Two responses. I think the main one is YF is an impossibility preemption case. As the Supreme Court pointed out, there was no express preemption provision that had this in addition to or different from. You are looking at pure conflict. Does state law require you to do something that federal law prohibits you from doing? Even for drugs, non-prescription drugs that are sold under an NDA are still subject to the express preemption provision, which says it is not only cases of pure direct conflict between federal and state law, it is also a case, if there is no federal requirement to do X, state law can't make you do X. So the reasoning of YF was there is a path to unilaterally change your label to address new risks. Not a federal requirement to do it, but federal law allows you so that it's not impossible to comply with both. Whether or not that's true here, you have a much stronger express preemption provision where you can't layer on any state requirement that is not the exact same, those are this Court's word and creature, as a federal requirement. I would also just note, the changes being affected regulation talks about risks, and it goes to Judge Rajan's question before. This is not about safety risk. This is not about harm. This is about efficacy. So we think it's outside the scope of the CBA regulation, but the more fundamental point is I think YF would have had a different result if it was applying a different preemption framework, and here we're in the express framework. One other question. Maximum strength, that was a part of a label that's not required by the FDA. It was more of a voluntary statement. Why is the claim preempted there if it's not something required by the labeling, the FDA's labeling requirements? Sure, Your Honor. Two responses to that. One, in the world of express preemption, where the question is not just it is preempted if state law is telling you not to do something that federal law is telling you to do, any additional requirements. So the fact that if federal law simply allows something without regulating it, or without telling you do it or don't do it, you can't have state law layer in on top and say you have to do this thing as a matter of state law that may be voluntary as a matter of federal law. The other point I want to make, they say that maximum strength is false and misleading. The reason they give in paragraph 70 of the complaint is that the products in maximum strength, despite the products having no efficacy at all. So we are running into the heartland of what the FDA has regulated here. Congress passed a law that says if you sell something in accordance with the monograph, it is deemed to be effective. So what they want to do is ask a jury to find that maximum strength is misleading because it is not effective. And we're just directly at loggerheads between state and federal law. So I want to ask, are there any limits? I mean, what do we do? Or is there any relief in the case of, and I'm not saying this is the scenario, but assume for me total capture by the FDA. Total capture. So corruption, ineffectiveness, so that there's no intent. Are you saying that because of the way the FDCA is drafted, there is literally nothing the consumer can do? There's nothing states can do to regulate? And I'm talking a total failure of the administrative state. Is there nothing that can be done? Sure. So I think there are things that can be done. One thing that can be done is in a safety case when someone actually gets hurt and is harmed because of that scenario. Then you have the product liability exception, and the express preemption doesn't apply. There might be questions of impossibility preemption, but you're in a totally different analysis. I think the other thing, Congress did set up a system that said we expect FDA to do its job. So it sounds like you have one answer, and that's the product liability. I have a second answer. And the second answer is not exactly a tort claim that a plaintiff can bring, but it's an agency process. Congress created a system where anyone can petition the agency. If you were aggrieved by that, you can then sue the agency in court. And so there is an APA path. It is more deferential than a jury making up its own mind about a complicated scientific issue. So Congress did create a number of different safety valves, but I don't think one of them was to just go to a jury applying state law and say the FDA just got it wrong, and therefore you should make a federally approved drug illegal. Okay. So, Michael, thank you. Thank you, Your Honor. Your Honors, let me turn to the preemption point. We believe that the district court made four different mistakes here. The first and most important is that it read into the FDCA scheme a conflict between state and federal law that we don't believe is there. The FDCA scheme begins and ends with the obligation not to misbrand. Under Section 331 of the Act, it is prohibited to introduce into interstate commerce anything that is misbranded. Under Section 337, that can even be a criminal offense. But is it misbranding if the labeling is following what's prescribed by the FDA? Well, what is prescribed by the FDA? It may turn out 20 years later that it was wrong, but along the way, the labeling is following what the FDA prescribes. And we agree with that. Along the way. The question is what happens when there is information that it is no longer the case and that information is held by the defendants here in this RICO conspiracy that we are... The labeling that has existed. Yes, Your Honor. But in Bartlett, in footnote four, the Supreme Court said that where liability is based on new and scientifically significant information that was not before the FDA, a drug may be considered misbranded. And in Wyeth, the point that I think Your Honor was getting at with Wyeth... I was just asking a question. I wasn't making a point. Apologize, Your Honor. The point that came to my mind at that point was that in Wyeth, the statement is quite clear from the Supreme Court. The manufacturer bears responsibility for the contest of its label at all times. We think the FDCA's misbranding provision is not only statutory obligation. It's right on the face of the monograph. The monograph begins with... I mean, the language is clear in Wyeth. I don't disagree with that. The argument is that Wyeth is different because here we're talking about an express preemption as opposed to implied or impossibility. Well, the district court said express preemption and there's express preemption for some matters. But as Justice O'Connor said in Benito Booth's case, something that's quoted extensively in Wyeth, where there is a recognition on the face of the statute by Congress that there is an ongoing role for state law, the preemption analysis does not work the same way. And what she said was the case for federal preemption is particularly weak where Congress has indicated its awareness of the operation of state law in the field of federal interest. This particular federal statute reserves the position for product liability under the laws of the states. Now, the district court misunderstood this to mean only physical injury. And it's true that most product liability cases come up in the personal injury context. But neither in the restatement nor in any other dispositive law is there a restriction of product's liability to something that only causes physical injury. And we cite to authority on that point. And the district court misunderstood what the significance is. It's not just that we're making claims, six different causes of action under New York state law that we think are all incorporated in product's liability, most notably the warranty claims. But it's also an indication that Congress did not intend to necessarily feel preempt. And everything in the district court's opinion flows from its first statement where it says, the very first beginning, it says, the FDCA vests authority in the FDA to determine whether a label is false or misleading. And that authority is exclusive. It's not exclusive under Wyeth because the manufacturer has an ongoing responsibility. And the claim here is that you cannot have a 10-year period where, again, we're on a motion to dismiss, so we have to accept the allegations, where there is knowing conduct to obscure the fact that this is ineffective. It is known as a scientific consensus by the people that the defendants retained in order to do the analyses. And they obscured that. And for a 10-year period, the FDCA didn't act because it didn't have source information that they needed from the manufacturers. Under those circumstances to say that consumers are at the mercy of a 40-year-old monograph. And the monograph, incidentally, the district court misread also, the monograph never says it is effective. The monograph says it is deemed effective if it meets the grace standard, generally recognized as safe and effective, which is statutory, as it must be statutory, as we argue in the brief under Loper, Bright, and Major Questions, and even under Chevron. There has to be some conformity to the statutory language. The statutory language is generally recognized as safe and effective at the point at which the scientific consensus that they had, but did not share with the world, deems that it's not effective, we're done. I would contrast the Colasza case that was subject to 28-J briefing involved ibuprofen in the decision of this court there. That's a modern monograph after the revisions. In that monograph, effectiveness is defined as do you release 85% of the medication within a 30-minute period. There's nothing in this monograph that speaks to any FDA findings with regard to the particulars of how this drug is effective. Let me ask you a practical question with respect to this claim. Assuming there's a monograph, assuming that along the way, as Judge Chin was saying, Johnson and Johnson and others discover that the decongestant doesn't do anything for you, is it really a labeling issue, or is it you're saying they shouldn't have offered the product at all? Were they supposed to mis-relabel it somehow, or were they supposed to take it off the market? Well, that's a question that gets into conflict and impossibility issues, which the district court didn't reach, and which are generally handled as a matter of fact as to how to resolve the conflict. We're nowhere near the facts, because we got thrown out on a motion to dismiss. But to answer your question fully, I think the statute is quite clear in Section 331. You can't do it. You can't introduce into commerce, into interstate commerce, something that is either unsafe or ineffective. All right. So I don't understand you to be arguing safety. No. I understand you to be arguing effectiveness. And why I ask this is that if they continue to market it, and it contained the ingredients that are covered by the monograph, did they have to make the same statement that's approved by the monograph? Well, the monograph— And that's why I wonder if what you're really claiming is not misbranding, but that they shouldn't have put it out for sale at all at that point. Our claim is a combination of the two, that once they fall under the prohibition on selling misbranded drugs, they are mislabeled. And they cannot continue to put out a label in that form. Now, they have a defense, which is, but we're not allowed to change the label on generics and over-the-counter drugs. And that's a matter of prohibition. It turns out that that is not a matter of formal prohibition. They can go to the FDA, consistent with their responsibilities under Wyeth, and say, look, we are here because this is no longer effective. That's what the statute encourages them to do. The statute, it turns out, is also not a prohibition, as reflected in the facts here, because Johnson & Johnson did change their label without any prior authorization, and changed it in order to reflect the scientific consensus, which is the statutory grace standard generally recognizes safe and effective. It no longer is so recognized. So can I just make sure? It sounds to me like there have been three different things introduced. One is the idea of additional labeling. One is the idea of different labeling. And one of them is the idea of getting pulled off the market. What do you, sitting here today, say is the statutory regime, or what is required in a case like this? Your Honor, I believe that— Or under state law. Under the state law, you're saying. I think you understand my question. Yes. So let me— State law is clear. You can't misbrand. You can't sell bad drugs. That's clear. The question is whether that's prohibited to the states as a matter of federal law. And I think that— I'm not an FDCA lawyer, but I spent a lot of time with the statute recently. And it seems to have multiple objectives, and it seems to have a belt and suspenders approach to it. So it makes things go through the monograph level process. It also requires that the label be updated with the best information and that there's an administrative procedure to do that. And it also says if you know that this is ineffective, if it doesn't meet the federal standards, you are prohibited from selling it in commerce. So it seems to put the requirement in at least three different places of how to cure this in order to protect the consuming public. What the district court did was it turned one of these, the monograph process, into an indulgence. It says no matter what you do from 1985 on, no matter what you know, no matter anything, you cannot change and you must continue to sell this as was. The law is not that way on the safety side, and we have clear cases on that. We don't have them on the effectiveness side. But the district court said, ah, yes, there's a separate provision in the statute for safety that comes after the general misbranding. So there's misbranding covers both safety and effectiveness, and then there's an additional provision. And the court, in a strained form of statutory construction, says that means that the entire misbranding obligations apply only to the safety side. That's not a supported form of statutory interpretation. I think my colleagues and I are satisfied.  Thank you very much. Your advisement was very helpfully argued.